UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| | |
|---|---|
| DAY & ZIMMERMANN INTERNATIONAL, INC., | ) ) ) |
| *Plaintiff*, | ) ) |
| | ) Case No. 2:18-cv-31 |
| v. | ) |
| | ) Judge Mattice |
| EASTMAN CHEMICAL COMPANY, | ) Magistrate Judge Wyrick |
| | ) |
| *Defendant*. | ) ) |

## **ORDER**

Before the Court is Defendant[1] Eastman Chemical Company's ("Defendant" or "Eastman") Motion for Summary Judgment. [Doc. 36]. Eastman contends that the undisputed record shows that Plaintiff Day & Zimmermann International, Inc. ("Plaintiff" or "D&Z") cannot prevail on any of its claims. D&Z argues that disputes of fact preclude summary judgment and that trial is necessary. For the reasons set forth herein, Eastman's Motion, [Doc. 36], will be **GRANTED**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 2002, Eastman and D&Z entered a Master Services Agreement ("2002 Agreement") under which D&Z would provide engineering, procurement, construction, and maintenance services. [*See generally* Doc. 37-2]. Eastman compensated D&Z for different kinds of costs by way of four different mechanisms: (1) direct reimbursement,

---

[1] Eastman is also a counter-plaintiff, while Day & Zimmermann is also a counter-defendant. [*See* Doc. 30].

-1-

(2) a multiplier system, (3) an hourly adder, and (4) a contractually-determined profit. [Doc. 37, at 2]. The only method at issue here is the multiplier system.

The multiplier system compensated D&Z for indirect labor costs and indirect costs by setting fixed multiplication rates that applied to D&Z's total engineering and procurement direct labor cost or other figures subject to compensation by direct reimbursement. [*See* Doc. 37-2, at 41-42, 72]. Section II.1.B.2 of the 2002 Agreement defined indirect costs and reads in full:

> INDIRECT COST is defined as the cost of employee benefits, paid time off, corporate office allocations, relocation expenses, drug tests, background checks (if required), building rental, building maintenance, utilities, property tax, business tax, CONTRACTOR's[2] license fees, and engineering license fees.
>
> The costs for CONTRACTOR and agency personnel in the ENGINEERING AND PROCUREMENT DIRECT LABOR COST category who are located on an EASTMAN site will be reimbursed according to the terms in Appendix A of the CONTRACT as "Personnel on an EASTMAN Site." The multiplier will be applied to the straight time salaries or wages paid to these employees.
>
> The costs for CONTRACTOR and agency personnel in the ENGINEERING AND PROCUREMENT DIRECT LABOR COST category who are located in CONTRACTOR's off-site office will be reimbursed according to the terms in Appendix A of the CONTRACT as "Personnel Not on an EASTMAN Site." The multiplier will be applied to the straight time salaries or wages paid to these employees.
>
> The costs for off-shore employees who are employees of the CONTRACTOR and/or subsidiary or partner and will be reimbursed by a multiplier as specified in

---

[2] "CONTRACTOR" means D&Z.

-2-

> Appendix A of the CONTRACT, which will be applied to the wages actually paid to such employees.
>
> These multipliers shall not apply to the premium portion of any overtime salaries or wages.
>
> EASTMAN shall reimburse Social Security, State Unemployment Insurance, Federal Unemployment Insurance and other payroll based charges required by law. These costs will be included in the Engineering/Procurement (EP) multipliers as estimates; EASTMAN and CONTRACTOR will reconcile the actual costs to the billed amount annually. This reconciliation is to occur before the end of the first quarter of the year following the year being reconciled.

[Doc. 37-2, at 41-42].

Eastman and D&Z operated under the 2002 Agreement for about a decade, although they amended it nearly two-dozen times before entering a new Master Services Agreement in 2013 ("2013 Agreement"). Relevant here, Amendment 9 in May 2006 changed the last paragraph of the indirect costs provision (changes underlined for clarity):

> Eastman shall reimburse Social Security, State Unemployment Insurance, Federal Unemployment Insurance and other payroll based charges required by law. <u>Actual Indirect costs shall be tracked historically by the Contractor.</u> These <u>indirect</u> costs will be included in the Engineering/Procurement (EP) multipliers as estimates <u>based on historical data and manpower and workload projections for the balance of the current year</u>; Eastman and Contractor will reconcile the actual <u>indirect</u> costs to the billed amount annually. This reconciliation is to occur before the end of the first quarter of the year following the year being reconciled, <u>and shall be applied to the project work assigned to Contractor during the calendar year following the year being reconciled.</u>

[Doc. 37-10, at 1-2]. Eastman concedes that the Parties redefined indirect costs and provided for full reconciliation—that is, actual costs for these categories were calculated and compared retrospectively to the multipliers, after which multipliers in the following year were adjusted up or down to reflect actual over- or under-billing—of those costs under Amendment 9. [Doc. 37, at 4 ("Amendment 9 changed the language of the reconciliation provision to provide for the reconciliation of all 'Indirect Costs' as that term had been defined." (emphasis original))].

In November 2012, the Parties effectively reversed Amendment 9 by reverting to the 2002 reconciliation language under Amendment 20:

> EASTMAN shall reimburse Social Security, State Unemployment Insurance, Federal Unemployment Insurance and other payroll based charges required by law. These costs will be included in the Engineering/Procurement (EP) multipliers as estimates. EASTMAN and CONTRACTOR will reconcile the actual costs to the billed amount annually. This reconciliation is to occur before the end of the first quarter of the year following the year being reconciled.

[Doc. 37-13, at 2-3]. Further, Amendment 20 stripped out the term "INDIRECT COST" and its definition, adopting a different approach to Section II.1.B that ultimately became the 2013 Agreement excerpt below.

In May 2013, Eastman and D&Z executed a new agreement to replace the 2002 Agreement. The 2013 Agreement followed the Parties' prior practice insofar as it used multipliers for various expenditures incurred by D&Z but, unlike the 2002 Agreement (before Amendment 20), Section II.1.B.2 did not explicitly define "indirect costs":

-4-

**Costs Reimbursed by Multipliers**

...

Cost of employee benefits, paid time off, corporate office allocations, relocation expenses, drug tests, background checks, building rental, building maintenance, utilities, property tax, business tax, CONTRACTOR's license fees, and engineering license fees.

The costs for CONTRACTOR and agency personnel in the Engineering and Procurement DIRECT LABOR cost category who are located on an EASTMAN site will be reimbursed according to the terms in Appendices A and B of the CONTRACT as "Personnel on an EASTMAN Site". The multiplier will be applied to the straight time salaries or wages paid to these employees.

The costs for CONTRACTOR and agency personnel in the Engineering and Procurement DIRECT LABOR cost category who are located in CONTRACTOR'S off-site office will be reimbursed according to the terms in Appendices A, B, and C of the CONTRACT as "Personnel Not on an Eastman Site". The multiplier will be applied to the straight time salaries or wages paid to these employees.

The costs for off-shore employees who are employees of the CONTRACTOR and/or subsidiary or partner and will be reimbursed as mutually agreed by CONTRACTOR and EASTMAN.

These multipliers shall not apply to the premium portion of any overtime salaries or wages.

EASTMAN shall reimburse Social Security, State Unemployment Insurance, Federal Unemployment Insurance and other payroll based charges as required by law. These costs will be included in the Engineering/Procurement (EP) multipliers as estimates. EASTMAN and CONTRACTOR will reconcile the actual costs to the billed amount annually. This reconciliation is to occur before the end of the first quarter of the year following the year being reconciled.

[Doc. 37-3, at 37].

Eastman and D&Z dispute whether "These costs" in the final paragraph of this section include all of the costs enumerated above, or just the costs enumerated in the preceding sentence—social security, unemployment insurance, and other payroll charges required by law—which are referred to collectively as statutory costs. The provision immediately following the multiplier excerpt quoted above reads as follows:

> **Costs Reimbursed by Adders**
>
> …
>
> Reconciliation [of costs reimbursed by adder] is intended to occur concurrently with the reconciliation of statutory costs reimbursed by hourly multipliers as specified in Appendix A.

[Doc. 37-3, at 37-38]. Appendix A contains a table laying out which costs are reimbursed and how, and cites to Appendix B, which contains the operative numerical multipliers and adders that apply to different categories of costs.

D&Z sued Eastman in March 2018, alleging that the 2013 Agreement required annual reconciliation of all cost categories subject to multipliers (not just statutory costs) and that Eastman had breached the agreement by failing to reconcile all costs. [Doc. 1]. In the alternative, D&Z alleged that Eastman induced D&Z to enter the 2013 Agreement by fraud, or else is liable under the doctrines of promissory estoppel or unjust enrichment. [*Id.*] Eastman moved for summary judgment as to all D&Z claims, and the Parties have fully briefed the Motion. Neither Party moved for summary judgment as to Eastman's counterclaims against D&Z.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th

Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

The crux of the dispute is the meaning of "These costs" in the final paragraph of the 2013 Agreement's Section II.1.B.2. [Doc. 37-3, at 37]. "These costs" are the multiplier costs subject to annual reconciliation. Either they include all the costs enumerated in that section (ranging from employee benefits to licensing fees), or they include only statutory costs, which means social security and unemployment insurance. D&Z maintains the former. In the alternative, it argues that even if "These costs" refers only to statutory costs, Eastman is liable for fraud, under a theory of promissory estoppel, or for unjust enrichment.

The Tennessee Supreme Court has recently reaffirmed that the "common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Individual Healthcare Specialists,*

-8-

Case 2:18-cv-00031-HSM-CRW   Document 47   Filed 12/13/19   Page 8 of 17   PageID #: 2159

*Inc. v. Bluecross Blueshield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019).[3] Indeed, *Individual Healthcare* thoroughly examined nearly two centuries of Tennessee contract law and concluded that Tennessee courts have "sought, albeit imperfectly, to achieve balance in contract interpretation" between strict textual analysis and a free-ranging inquiry as to the context surrounding contract formation. *Id.* at 694. Even so, "the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." *Id.*

Even cases "favoring the use of context evidence," however, "held the line" on parol evidence. *Id.* at 695. Indeed, where "the parties' contracts are fully integrated, general extrinsic evidence of context may be used to interpret the contractual language in line with the parties' intent, but the parol evidence rule prohibits use the use of evidence of pre-contract negotiations in order to vary, contradict, or supplement the contractual terms." *Id.* at 697. In other words, the rule bars use of extrinsic evidence to enlarge the obligations of a fully integrated contract "even if that evidence is consistent with the written terms of the contract." *Id.* at 696. In any case, where "a contract is unambiguous, the court may not look beyond the four corners of the contract to ascertain the parties' intention." *Battery Alliance, Inc. v. T & L Sales Inc.*, No. W2015-00201-COA-R3-CV, 2015 WL 6873202, at *5 (Tenn. Ct. App. Nov. 9, 2015).

Framed in isolation, whether "These costs" in the 2013 Agreement refers to the prior section or the prior sentence—statutory costs only—may not be obvious. The Court,

---

[3] "When a contract is not ambiguous, its interpretation is a question of law that is appropriate for summary judgment." *Battery Alliance, Inc. v. T & L Sales Inc.*, No. W2015-00201-COA-R3-CV, 2015 WL 6873202, at *5 (Tenn. Ct. App. Nov. 9, 2015). As will be seen below, the 2013 Agreement is unambiguous and therefore properly subject to interpretation by the Court.

-9-

however, cannot ignore that the very next section in the agreement states that "Reconciliation [of costs reimbursed by adder] is intended to occur concurrently with the *reconciliation of statutory costs reimbursed by hourly multipliers* as specified in Appendix A." [Doc. 37-3, at 37-38] (emphasis added). Moreover, "These costs" is contained in the middle of a paragraph dealing only with statutory costs, rather than set apart in its own paragraph, as one would reasonably expect of a provision aimed at the entirety of Section II.1.B.2. *Cf. Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 460 (6th Cir. 2006) ("The fact that the language in question forms one separate and distinct paragraph, while not dispositive, is significant. The placement of terms implies a relationship between provisions."). In fact, the paragraph above containing "These costs" leads with "These multipliers" and appears aimed at the entire section. Were "These costs" and "These multipliers" both intended to apply to the entire section, one would expect consistent draftsmanship, but the former is contained in a paragraph about a specific kind of cost (statutory costs) while the latter stands apart and alone. Reading the 2013 Agreement altogether, the Court cannot help but conclude that "These costs" refers unambiguously to the preceding sentence, that is, to statutory costs.

In their briefs, the Parties do not discuss whether the 2013 Agreement is fully integrated and instead treat ambiguity as the touchstone for whether extrinsic evidence should be considered in this case. [*Compare* Doc. 37, at 13 ("Before the Court can consider parol evidence ... [it] must first determine that the language in the 2013 Agreement is ambiguous."), *with* Doc. 39, at 12[4] ("Because the 2013 Agreement is ambiguous, there is no bar to parol evidence.")]. Because the 2013 Agreement is unambiguous as to which

---

[4] The Court uses D&Z's pagination, rather than the PDF pagination.

-10-

costs are "These costs," the Parties may not rely upon, and the Court will not consider, extrinsic evidence of their intent.

D&Z maintains that the broader context compels its interpretation because "These costs" are the ones that are "included in the Engineering/Procurement (EP) multipliers as estimates" while the other multiplier categories say no such thing, and that it could not win its contractually-guaranteed profit margin without reconciliation. The first argument is belied by Appendix A, which is referenced through Section II.1.B.2 and explains in detail which costs are subject to multipliers. [*See* Doc. 37-3, at 44]. The second argument is belied by D&Z itself, which returned interrogatories explaining that under the 2013 Agreement D&Z's "profit was determined by adding 5% for Engineering Services and 4% to Construction Management services to the multiplier for indirect costs, also expressed as a percentage" with dollar amounts for 2013-2017 provided separately. [Doc. 43-5, at 10-11]. Indeed, not reconciling all costs does not preclude application of the "5% Profit markup" for the multipliers as referenced in Appendix B. [Doc. 37-2, at 45]. The 2013 Agreement reflects that the profit markup is a formulaic compensation mechanism set by the Parties, not a guarantee that reconciliation of all costs subject to multipliers must occur in order to avoid "one party necessarily being in breach." [Doc. 39, at 15]. The Parties may avoid breach simply by applying the contractually-set profit markup as specified.

D&Z also argues that the rule of practical construction warrants consideration of the Parties' course of dealing prior to the 2013 Agreement, that is, their course of dealing under the 2002 Agreement. The rule of practical construction, however, holds that "the interpretation placed upon a contract by the parties thereto, as shown by their acts [and

-11-

declarations], will be adopted by the court." *Individual Healthcare*, 566 S.W.3d at 693 n.21. Were the relevant language in the two agreements identical, this argument may hold some merit. But the Parties' dealings under the 2002 Agreement is inappropriate for consideration as to the 2013 Agreement because, as discussed above, the language in Section II.1.B as amended[5] under the 2002 Agreement differs from that in the 2013 Agreement.

Eastman argues that Tennessee's Statute of Frauds bars any collateral agreement made "orally or through [the Parties'] actions" that would require reconciliation of all costs under the 2013 Agreement. [Doc. 37, at 16]. But the core of D&Z's case is "the dispute over what is covered by the multiplier reconciliation provision" as written. [Doc. 39, at 12 n.4]. D&Z therefore is not arguing that a collateral agreement exists, but that the agreement it signed obligates full reconciliation. Because the 2013 Agreement unambiguously does not require full reconciliation, however, a statute of frauds analysis is unnecessary.

The Court therefore concludes that summary judgment as to D&Z's breach of contract claim is appropriate in light of the 2013 Agreement's unambiguous language. D&Z pled in the alternative fraud in the inducement, promissory estoppel, and unjust enrichment (quasi-contract). The Court addresses each in turn.

---

[5] As explained above, Amendment 9—operative from May 2006 until November 2012—used different reconciliation language. This is true until Amendment 20, which reverted to the original reconciliation language but also modified other portions of Section II.1.B. The Amendment 20 version of Section II.1.B was incorporated into the 2013 Agreement, which the Parties executed roughly six months later. In sum, Section II.1.B in the 2013 Agreement differs even from the pre-Amendment 9 Section II.1.B in the 2002 Agreement.

-12-

To successfully establish fraud in the inducement, the allegedly defrauded party must show:

> (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

*Am.'s Collectibles Network, Inc. v. Sterling Commerce (Am.), Inc.*, No. 3:09-cv-143, 2016 WL 9132294, at *5 (E.D. Tenn. Sept. 7, 2016) (quoting *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000)).

D&Z maintains that the false statement of material fact underlying the fraud occurred in the body of an April 2013 email from Eastman employee Gary Kerr when he sent a draft version of the 2013 Agreement to D&Z. The relevant portion of the email, with the locus of D&Z's fraud claim italicized, stated:

> Because our contract document is so full of outdated information and is, frankly, nearly impenetrable, we decided to take this opportunity to clean it up by removing the addenda for sites no longer in the Eastman portfolio, excising the outdated mark-up tables, and incorporating into the body of the contract all of the changes agreed upon in previous amendments.
>
> *Other than the instances that I'll discuss below, there was no attempt to change active contractual terms.* ... [Kerr then summarized six changes, none related to reconciliation or multipliers].

[Doc. 39-2, at 251-52 (emphasis added)]. The problem with D&Z's position is that the relevant portion of the 2013 Agreement—Section II.1.B—adopts the language of then-operative Amendment 20 (pertaining to multipliers and reconciliation), which Kerr acknowledges when he says the 2013 Agreement "incorporate[s] into the body of the

-13-

contract all of the changes agreed upon in previous amendments." [*Id.*] Indeed, *active* contractual terms in April 2013 included Amendment 20, which the Parties had executed in November 2012. [Doc. 37-13].

D&Z cites portions of the record indicating that Eastman viewed the 2013 Agreement as an opportunity to obtain more favorable contract terms at D&Z's expense. But whatever Eastman's motivation, D&Z must establish a genuine dispute of fact as to whether Eastman made a materially false statement. This it has not done, for the 2013 Agreement carried forward active contractual terms at the time of its execution precisely as Kerr said it would. Summary judgment as to D&Z's fraud claims is therefore appropriate.

Promissory estoppel is "not liberally applied" and requires the plaintiff to "establish the following elements: '(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment.'" *Kinard v. Nationstar Mortg. LLC*, 572 S.W.3d 197, 210 (Tenn. Ct. App. 2018) (quoting *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007)).

D&Z, drawing exclusively from Kerr's April 2013 email, asserts that "Eastman's promise was unambiguous: 'there was no attempt to change active contractual terms' in the 2013 Agreement." [Doc. 39, at 21]. If this is an unambiguous promise to reconcile all costs subject to multipliers rather than just statutory costs, the Court cannot see how. Moreover, "active contractual terms" means the multiplier provision as written in Amendment 20 and which ultimately became Section II.1.B of the 2013 Agreement. In other words, D&Z has not shown that Eastman did anything other than what it promised

in Kerr's email, to the extent that it promised anything at all. Summary judgment as to D&Z's promissory estoppel claim is therefore appropriate.

Unjust enrichment is "a quasi-contractual theory," that is, "a contract implied-in-law" where a court "may impose a contractual obligation where one does not exist." *Whitehaven Cmty. Baptist Chuch v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). This includes situations where the parties had a contract but it "has become unenforceable or invalid" and "the defendant will be unjustly enriched absent a quasi-contractual obligation." *Id.*

D&Z's quasi-contract claim hinges on its position that a reasonable jury could find "that the 2013 Agreement is void" because of fraudulent inducement. [Doc. 39, at 25]. But the Court has concluded that D&Z has not produced sufficient evidence establishing a genuine dispute as to the elements of fraud, as it must to survive summary judgment. Accordingly, the Parties do have a valid contract, precluding application of a quasi-contractual remedy. Summary judgment as to D&Z's unjust enrichment claim is therefore appropriate.

The Parties dispute whether it is proper for the Court to consider proposed but unadopted Amendment 3 to the 2013 Agreement. Eastman maintains that it is a settlement negotiation document subject to exclusion under Federal Rule of Evidence 408,[6] while D&Z argues that it is not settlement-related and probative as to how Eastman interpreted the 2013 Agreement.

---

[6] The Rule prohibits admission of "evidence of the following ... (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made

-15-

Proposed Amendment 3 states that "the Parties wish to settle all reconcilable charges related to the Agreements." [Doc. 37-18, at 1]. D&Z maintains that "there was no dispute over the past amounts due," [Doc. 39, at 10], and therefore no compromise negotiation susceptible of exclusion under Rule 408. But the Court cannot see what the Parties would wish to settle if not a dispute, and indeed, when asked "[a]nd the purpose of this proposed Amendment 3 was to resolve the dispute over the payment of the multiplier, correct?" D&Z's corporate representative answered "[i]t was to settle and pay all the outstanding amounts at the time that were calculated as owed [by D&Z] on the multiplier reconciliation." [Doc. 37-1, at 268:2-7]. Indeed, "we [D&Z] were willing to concede that we would give up some of the money owed" to continue the contract with Eastman. [*Id.* at 268:16-17]. Exclusion under Rule 408 is therefore proper, barring consideration of proposed Amendment 3.

## IV. CONCLUSION

For the reasons set forth, Eastman's Motion for Summary Judgment, [Doc. 36], is hereby **GRANTED**. D&Z's claims are hereby **DISMISSED WITH PREJUDICE**. In its Amended Answer and Amended Counterclaims, [Doc. 30], Eastman alleged a variety counterclaims against D&Z on which neither Party moved for summary judgment. Accordingly, those claims shall proceed to trial.

---

during compromise negotiations about the claim." Fed. R. Evid. 408(a). The "purpose underlying Rule 408 … is 'the promotion of the public policy favoring the compromise and settlement of disputes that would otherwise be discouraged with the admission of such evidence.'" *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 805 (6th Cir. 2007) (quoting *Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996)).

**SO ORDERED** this 13th day of December, 2019.

*/s/ Harry S. Mattice, Jr.*
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE